IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

ANDREA Q. JIVENS-PIERSON,          )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )   Case No. 10-CV-663-PJC
                                    )
MICHAEL J. ASTRUE, Commissioner of the )
Social Security Administration,     )
                                    )
        Defendant.                  )

**OPINION AND ORDER**

Claimant, Andrea Q. Jivens-Pierson ("Jivens-Pierson"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Jivens-Pierson's application for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Jivens-Pierson appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that she was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

**Claimant's Background**

Jivens-Pierson was born on July 15, 1980, and was 20 years old as of her asserted date of onset of disability, March 9, 2001. (R. 41, 207, 209). She completed the 11th grade and received her certificate as a Certified Nursing Assistant ("CNA"). (R. 42).

1

Jivens-Pierson's last job was as a CNA at a nursing home where she worked for three weeks before leaving in October 2005. (R. 43). She worked as a CNA from November 2002 through February 2003 and again from 2004 to October 2005. (R. 44, 292). Prior to that she worked as a sandwich maker.

Plaintiff testified to the following. She left her job in October 2005 because she was having issues with her son. (R. 43). Jivens-Pierson complained that she was unable to work since then because of problems with her left ankle, knees, back, left shoulder, anxiety, depression, panic attacks, and lack of bladder control. (R. 45-52). She has throbbing pain in her left shoulder and her doctors have told her not to lift heavy things. (R. 46-47). She has trouble reaching up and out with both arms and staying focused. *Id*. She has continuing problems with bladder infections and incontinence, as well as lower back pain due to moderate disc degeneration (R. 46-47). She can touch her knees but not her toes and has difficulty walking up and down a flight of stairs. (R. 48). On average she drives three or four miles a week and has some difficulty with the pedals as her right leg is shorter than the left. (R. 49). The difference in the lengths of her legs also causes her to stumble and fall two or three times a week. (R. 57). She has no problems with fingering or handling, though her hands get stiff if she is writing or holding something too long. (R. 49-50). She cannot crawl, kneel or bend very much because of pain in her knees. (R. 50). She has had three surgeries on her left ankle after she fractured it on March 9, 2001, necessitated by problems with the plates and screws used to stabilize it. (R. 50). This causes sharp, shooting pain with the cold and swelling with the heat and difficulty with excessive walking. (R. 50-51). She also suffers from headaches once a day that last on average about an hour or two which she treats by lying down and going to sleep. (R. 60-61). She washes her dishes and dusts, and with help from a friend, she "slightly" sweeps, mops, vacuums, makes

her bed, does laundry, cooks, and shops. (R. 53-54, 57).

She is depressed and anxious "a lot" and, though she is on medication and receiving counseling, she can't stay focused or remember and has problems getting along with people some of the time. (R. 51-52). She has had psychological problems since she was eight which worsened when her mother died. (R. 58). She has had thoughts of suicide and she hospitalized herself in 2008 because she was "overwhelmed" with dealing with her son and having no support. (R. 58). She is depressed every day and cannot leave the house four or five days a month. (R. 59). She doesn't socialize except sometimes with friends in her apartment complex. (R. 54). She has been in abusive relationships with men and is frightened that "they're going to come after me again." (R. 60).

Jivens-Pierson moved to Tulsa, Oklahoma in 2007 from Minneapolis, Minnesota. Her medical records from Minnesota reflect the following.

She fractured her left fibula on March 9, 2001 while walking down the stairs and underwent surgery the next day. (R. 371-75). Her surgeon, Jonathan Asp, M.D., placed screws and a C-arm plate internally to fixate the ankle. (R. 371-73). She was at that time referred to the Family Practice Clinic as she tested positive for pregnancy. (R. 370). When she returned for follow-up visits complaining of ankle pain, Dr. Asp informed her that the syndesmotic screws would need to be removed. (R. 360-61). On May 29, 2001, Jivens-Pierson underwent another surgery to replace the single mortis screw with two mortis screws. (R. 359). An x-ray of her ankle taken on June 6, 2002 revealed a fracture in one of the horizontal screws. (R. 402). On July 24, 2001, Dr. Asp noted that she was doing well and he recommended that she consider removing the syndesmotic screws after the delivery of her child. (R. 356). An x-ray of her ankle on March 27, 2002, showed a fracture plate on the fibula with seven screws with two of the

screws passing into the tibia. (R. 401). The report noted a "zone of lucency about both of [the] tibial screws" and the lower of the two screws was broken. *Id.* Jivens-Pierson, however, did not return to see Dr. Asp until September 25, 2002 when she complained about the pain in her left ankle. (R. 354). At that time, x-rays indicated that the screws were moving; one was fractured; and there were "slight windshield wiper changes in the bone." *Id.* She returned on October 30, 2002 complaining of left ankle pain and explaining that she canceled her scheduled screw removal because she got a job and didn't want to miss work. (R. 353).

The x-ray of her ankle taken on March 3, 2005 revealed that one of the screws was broken and the other may be loose. (R. 405). Jivens-Pierson, however, did not present for possible surgery until three years later on March 8, 2005, still complaining of the pain, and Dr. Asp scheduled her again for surgery. (R. 352). She underwent surgery on April 21, 2005 and the screws were removed, but the plate was left in place. (R. 350, 390). At that time, Dr. Asp stated that she would be unable to work from April 21, 2005 through May 5, 2005 and should not apply for disability benefits. (R. 362-63). On July 14, 2005, she presented to the emergency room complaining of right knee pain and was diagnosed with "possible cartilaginous injury." (R. 391-92).

In her records from the North Memorial Family Practice Clinic from March 22, 2001 through July 10, 2007, Jivens-Pierson was seen on multiple occasions for treatment of sexual issues, including pregnancy and contraception, and was consistently noted as being obese. (R. 420-89). From March through October 2001, she received pre-natal care and on several occasions reported that she was suffering from lower back pain and depression.[1] (R. 476-88). On

---

[1] Jivens-Pierson was evaluated for her depression by Dr. Arlene P. Boutin on June 3, 2001. (R. 339-40). Dr. Boutin diagnosed her with depression and assessed her with a Global Assessment of Functioning ("GAF") of 50. (R. 340).

4

April 12, 2002, she reported daily headaches that were "frontal occipital in nature" that "go away on their own."(R. 473-75).

On August 14, 2002, she went to the emergency room complaining of chest and back pain. (R. 383-85, 467). Chest x-rays were normal and the emergency room physician diagnosed her with atypical chest pain and possible pleurisy and prescribed pain medication. (R. 384). Chest x-rays were again taken on March 14, 2003, and they were normal. (R. 387, 403-404). On July 23, 2003, she reported she had experienced ten episodes when she felt hot, had blurry vision, shortness of breath, a panicky feeling and almost passed out. (R. 456-57).

She complained of nausea and sharp abdominal pain in the right upper quadrant on February 24, 2005 and was diagnosed with a urinary tract infection. (R. 438-39). An ultrasound of her abdomen taken on November 19, 2005 was normal. (R. 406). She was at that time diagnosed with a right ovarian cyst and acute gastritis. (R. 394). She again reported to the emergency room complaining of abdominal pain on March 30, 2005 and was assessed as probably having pelvic inflammatory disease. (R. 388).

On December 25, 2005, Jivens-Pierson went to the emergency room complaining of a headache that had started the night before. (R. 396). During this visit, she reportedly was verbally abusive toward her 4-year-old son and threw him against the wall. *Id*. Child Protection Services was contacted and acknowledged previous experience with Jivens-Pierson. *Id*.

On April 21, 2006, she presented to the clinic complaining of chest pain, fatigue, headaches and pain throughout her body. (R. 490-91). She thought that she was having an anxiety attack as she had been very stressed, crying a lot and unable to find a job. *Id*.

On October 16, 2006, Jivens-Pierson complained of daily back pain she had experienced for several months, describing its severity as 10 out of 10, hurting worse with bending and

5

moving. (R. 609). Also she complained of significant pain when going from sitting to standing, that shoots down her legs two out of three times. *Id.* Saul A. McBroom, M.D., examined her and reviewed her July 26, 2006 MRI[2] before recommending that she undergo physical therapy and take medication for her low back pain and right hip flexor pain. (R. 611-12). Jivens-Pierson was seen again on November 1, 2006 by LuaAnn Kibira, a nurse practitioner at the clinic, to discuss the July 26, 2006 MRI and Kibira attributed the moderate degenerative changes in her lower back to Jivens-Pierson's morbid obesity and excessively large breasts. (R. 607-08). Kibira suggested that although "there was nothing extremely serious" in the MRI, Jivens-Pierson should consider weight loss, including possible gastric bypass, and breast reduction and referred her for physical therapy. (R. 608). Jivens-Pierson underwent physical therapy from November 2006 to May 2007, and was released from therapy to home exercises and chiropractic care. (R. 571-92).

On November 28, 2006, Jivens-Pierson also discussed with Kibira her problems with anxiety. (R. 604-06). She admitted to problems with depression and anxiety since her teens which worsened upon her mother's death in 1995. She reported poor sleep and excessive fatigue. Kibira prescribed antidepressants and referred her for individual therapy with Dr. Jerica Berge in the clinic. (R. 606).

In her April 24, 2007 visit with Kibira, Jivens-Pierson reported that she could not continue on Trazadone because it made her too sleepy and her 5-year old son with ADD "almost burnt the house down" when she was "knocked out" by the drug. (R. 601). She admitted that she did not meet with Dr. Berge or do any follow-up regarding her self-therapy. (R. 601-02).

---

[2] The MRI showed no focal protrusion, central or neural foraminal compromise at the lumbar levels but noted multi-level moderate, degenerative facet change in the lumbar spin, prominently at L5-S1 and degeneration and mild narrowing of the T11-12 disk space. (R. 611, 637).

Although she did follow up with a general surgeon regarding possible breast reduction to relieve her back pain, she stated that they asked her to lose as much weight as possible first. Kibira referred her for another course of physical therapy which combined chiropractic with physical therapy. (R. 602).

When Jivens-Pierson returned to the clinic on May 9, 2007, she was seen by Dr. Michael Lockheart who noted her "significant anxiety" because she may be pregnant. (R. 598-600). She reported that she had not followed up with Dr. Berge but had one visit with Nancy Becks, a mental health social worker. (R. 599). In a follow-up visit to the clinic on June 14, 2007, Kibera noted that Jivens-Pierson was in the "extreme obesity 3 category, " weighing 234 pounds with a body mass index of 43, and had been unsuccessful in losing weight and did not think that she was "that big." (R. 595-96). Jivens-Pierson informed Kibera that she planned to move to Oklahoma at the end of June so her father could help her care for her son. (R. 596). Kibera recommended that she seek bariatric surgery in Tulsa and continue home exercises. (R. 597).

Her medical records from Tulsa consist of emergency room visits to St. Francis Hospital from December 5, 2007 through August 8, 2008. (R. 550-68, 644-654). She first presented with acute L-5 low back pain from picking up her son and advised the attending physician, Dr. Mary Thompson, that she had suffered from back pain for years and physical therapy and chiropractic care was no help. (R. 562-66). An x-ray showed no significant radiographic abnormality. (R. 560). She was prescribed muscle relaxant and pain relievers. (R. 566). In subsequent visits, she was treated for upper respiratory infections. (R. 551-58, 649-54). On August 9, 2008, however, she complained again of back pain. (R. 644-48). Dr. Charles Rodman found that she had tenderness of the lumbar paraspinals, but no weakness or neurologic deficits in her lower extremities. (R. 645). Dr. Rodman prescribed her more Flexeril and Lortab and referred her to

7

the OSU Family Medicine Clinic. *Id*.

Upon referral, Jivens-Pierson went to the Morton Comprehensive Health Services from September 24, 2008 through July 14, 2009. (R. 676-86). She presented complaining of low back pain radiating down her left leg that caused numbness and tingling. (R. 678, 685). On examination, Dr. Syeachia Dennis noted tenderness in her lower back on palpitation of both sides, lumbosacral spinal pain with extension, flexion and rotation to both sides, and "abnormalities" in her hips. (R. 678, 685). A MRI of her lumbar spine taken on October 15, 2008 revealed mild facet arthropathy at L4-S1 and mild bilateral foraminal stenosis at L5-S1 with no other abnormalities. (R. 682). She was assessed with mild degenerative changes at L4-5 and L5-S1. (R. 680).

Jivens-Pierson was also seen for psychological treatment at the Tulsa Center for Behavioral Health. (R. 639-43, 668-75). An August 1, 2008 record shows that she was referred for evaluation after DHS took her son from her home. (R. 641-43). She was assessed with adjustment disorder with depressed mood and was given a GAF[3] of 38. (R. 642). She was subsequently admitted to the hospital for evaluation on November 18, 2008 pursuant to a duty to warn by Dr. Kearns, a physician where Jivens-Pierson's son was placed, who reported that Jivens-Pierson told her that she was going to kill her father and then herself. (R. 672). Once

---

[3] The GAF score represents Axis V of a Multiaxial Assessment system. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 32-36 (4th rev. ed. 2000) (hereinafter, "DSM-IV-TR"). A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*. And scores of 51-60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*.

hospitalized she said she was just "venting" as she was distressed about having her son taken from her and being kicked out of her apartment. (R. 672-73). Her treating physician, Dr. Louise Price, initially diagnosed her with mood disorder NOS and relationship problems and assessed her with a GAF of 35. *Id*.

Upon referral by DHS, she was evaluated by Dr. Larry Vaught on August 19, 2008. (R. 633-36). Jivens-Pierson related that her 6-year-old son was taken from her home in May 2008 after she stabbed her boyfriend while being choked, for which she was subsequently incarcerated. (R. 633). She admitted that she had problems with her son who had been diagnosed with ODD and ADHD. (R. 633). She reported that she was prescribed Celexa in Minnesota and at the Tulsa Center for Behavioral Health for depression but she essentially refused to take the medication. (R. 635). The results of her MMJPI-II test showed substantial psychological distress with possible antisocial features, persecutory ideation, poor insight and underestimation of her role in her problems. *Id*. Dr. Vaught diagnosed her with Major Depressive Disorder ("MDD"), recurrent, moderate without psychotic features with a GAF of 65 and recommended individual counseling and psychiatric consultation. (R. 635-36).

There are two consultative examinations in the record. The first was a psychological evaluation performed by consultative agency physician, Dr. Alford Karayusuf, in Minnesota on May 8, 2006. (R. 492-94). Dr. Karayusuf noted that Jivens-Pierson had tried to kill herself on several occasions and still had occasional suicidal ideation. He diagnosed her with MDD, recurrent, mild to moderate in degree, in partial remission. (R. 493). He concluded that she was able to understand, retain and follow instructions, was restricted to superficial interactions with fellow workers, supervisors and the public, and "within these parameters, she is able to maintain pace and persistence." (R. 494).

The second consultative examination was a physical assessment performed by Dr. Beau C. Jennings on December 2, 2008. (R. 655-67). X-rays of her lumbar spine, knees and shoulders were normal except for mild joint space narrowing at L5-S1, compatible with mild degenerative disc disease, and mild degenerative joint space disease of the medial right knee. (R.656-60). He diagnosed her with chronic lumbar pain and obesity. (R. 655).

A Physical Residual Functional Capacity Assessment was completed by agency physician, Aaron Mark, M.D. on May 12, 2006. (R. 509-16). Dr. Mark found that Jivens-Pierson could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for a total of 6 hours in an 8-hour workday, sit for a total of 6 out of 8 hours with normal breaks, and could push and/or pull without limit. Her only other limitations were to limited balancing to occasionally and avoid environmental hazards. (R.511, 513). Dr. Mark based his assessment on the medical records concerning repair of her left ankle and removal of the hardware and the July 2005 emergency room visit for right knee effusion and pain. (R. 510-11). He noted that she was diagnosed with a small cartilaginous injury to her knee, placed in an immobilizer and told to exercise and there were no further visits or complications. (R. 511). Stating that he had considered her complaints of pain, Dr. Mark noted that she had been denied several times previously for the same allegations and she was "partially credible." *Id.* This assessment was affirmed by agency physician Charles T. Grant on June 28, 2006. (R.542-44).

A Psychiatric Review Technique Form was also completed on May 12, 2006. (R. 495-507). For Listing 12.04, agency psychologist R. Owen Nelsen, Ph.D., assessed Jivens-Pierson as having depressive syndrome in partial remission. (R. 498). For the "Paragraph B Criteria,"[4]

---

4     There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining

10

Dr. Nelson found that Jivens-Pierson had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 505). In the "Consultant's Notes," Dr. Nelson stated that he reviewed Dr. Karayusuf's consultative examination report of May 9, 2006 and Dr. Boutin's June 3, 2001 assessment and GAF evaluation. (R. 507). Based on that evidence, he diagnosed her with MDD, recurrent, mild to moderate in partial remission and concluded that she was able to understand and follow directions and interact with others on a superficial level. (R. 507). Dr. Nelson referred to his Mental Residual Functional Capacity Assessment for her limitations. *Id*.

In his mental RFC assessment, Dr. Nelson found that Jivens-Pierson was markedly limited in (1) the ability to understand and remember detailed instructions and (2) to carry out detailed instructions. (R. 517). He also found her moderately limited in the ability (1) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (2) to work in coordination with or proximity to others without being distracted by them, (3) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (4) to interact appropriately with the general public and (5) to respond appropriately to changes in the work setting. (R. 517-18). Agency psychologist James M. Alsdurf, Ph.D., reviewed and affirmed Dr. Nelson's findings on June 29, 2006.

**Procedural History**

On September 19, 2005, Jivens-Pierson protectively filed an application for disability

---

concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

insurance benefits under Title II, 42 U.S.C. § 401 *et seq.* and supplemental security income ("SSI") benefits under Title XVI, 42 U.S.C. §1381 *et seq.* (R. 210-20).[5] She alleged disability beginning October 1, 2004. Her applications for benefits were denied in their entirety initially and on reconsideration. (R. 98-103, 104-07). Jivens-Pierson appeared before ALJ Gene M. Kelly on June 19, 2008 *pro se*. (R. 73-91). As several medical records were purportedly missing, the ALJ continued the hearing and had Jivens-Pierson sign medical releases for the records. (R. 73-91). Claimant was represented by counsel at the second hearing held on September 15, 2008. (R. 34-72). By decision dated March 23, 2009, the ALJ found that Jivens-Pierson was not disabled from October 1, 2004 through the date of the decision. (R. 8-17). On August 27, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981; 416.1472.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

---

[5] Jivens-Pierson also protectively filed an application for child's insurance benefits on September 19, 2005, alleging disability beginning March 9, 2001. (R. 227-31). After agency denials initially and on reconsideration, a hearing was held on September 15, 2008 and on March 10, 2009, the ALJ found the claimant not disabled prior to July 14, 2002, the date she turned 22. (R. 22-31). The Appeals Council denied review on August 27, 2010. (R. 1-4). Claimant did not appeal this final decision by the ALJ to this court.

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520; 416.920.[6] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.

---

[6] Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.972. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520©, 416.920©. If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. §§ 404.1520, 416.920.

*Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Jivens-Pierson met insured status through December 31, 2005. (R. 10). At Step One, the ALJ found that she had not engaged in any substantial gainful activity since her alleged onset date of October 1, 2004. *Id.* At Step Two, the ALJ found Jivens-Pierson had the following severe impairments: problems with ankles, knees, back, shoulder, legs and hands; depression; anxiety; bladder problems; headaches; and obesity. (R. 12-11). At Step Three, the ALJ found that her impairments did not singly or in combination meet any Listing, specifically Listings 1.02 (major dysfunctions of a joint), 1.04 (disorders of the spine), 12.04 (affective disorders) and 12.06 (anxiety related disorders). (R. 12-13).

> The ALJ determined that Jivens-Pierson had the RFC to perform medium work except occasionally climb ropes, ladders, and scaffolds; need to change positions from time to time; avoid unprotected heights and fast and dangerous machinery; would need work to be simple, repetitive and routine; slight limitation in contact with public, co-workers, and supervisors; would not limit work on assembly line but not a part of a team; and takes medication for relief but would not preclude claimant from sedentary, light, or medium exertion work.

(R. 13-16). At Step Four, the ALJ found that she could return to past work as a sandwich maker as it was actually and generally performed. (R. 16-17). But if she could not, the ALJ found at Step Five, that there were jobs that a person with Jivens-Pierson's RFC could perform; *e.g.*,

> janitor, unskilled, medium exertional, regional 12,000, national 120,000, DOT# 381.687-014; bench assembler, unskilled, light exertional, regional 30,000, national 450,000, DOT# 780.684-062; motel housekeeper, unskilled, light exertional, regional 11,000, national 180,000, DOT# 323.687-014; and optical good assembler, unskilled, sedentary exertional, regional 1800, national 24,000, DOT# 713.687-018.

(R. 16-17). Therefore, the ALJ found that Jivens-Pierson was not disabled from October 1, 2004 through the date of his decision. (R. 17).

**Review**

Jivens-Pierson contends that the ALJ erred in (1) propounding an incomplete hypothetical to the vocational expert ("VE"); (2) failing to properly consider the medical source opinions; (3) failing to perform a proper credibility determination; and (4) failing to properly consider her obesity.

Claimant argues that the hypothetical propounded by the ALJ to the VE did not include all of Jivens-Pierson's impairments, specifically some of the nonexertional mental limitations found by the agency reviewers. Further, she complains that although the ALJ mentioned some of Jivens-Pierson's low GAF scores, he failed to note that low GAF scores were assessed by treating physicians or their teams, and the only score over 50 came from a one-time assessment by a consulting examiner. And when the VE was asked about the effect of low GAF scores on Jivens-Pierson's ability to hold a job, the VE responded that she was not qualified to answer the question but that in her experience individuals with serious occupation functioning problems did not normally maintain work.

The Commissioner contends that the ALJ included in the hypothetical all the limitations he found supported by the record, which is all that is required. The ALJ gave the agency reviewers' opinions "considerable weight," though not "controlling weight," and considered Claimant's testimony that she sometimes had memory and concentration problems and difficulty getting along with people. Accordingly, the ALJ's findings incorporated in the hypothetical to the VE that she could perform simple, repetitive, routine work with a slight limitation in contact with the public, co-workers and supervisors, and was unable to work as part of a team were supported by the record. In addition, GAF ratings without further narrative explanation do not evidence an impairment that seriously interferes with ability to work, nor is a question to the VE

15

about the effect of a GAF score of 50 on a claimant's ability to work a proper hypothetical as it does not delineate specific work-related restrictions and thus is too vague to illicit a proper response. In any case, one of the GAF scores was more than three years prior to the alleged onset date and the other three were within a four-month period in 2008 when Jivens-Pierson was having legal problems due to assaulting her spouse and losing custody of her son and are not indicative of her functioning outside that period of time.

The ALJ's hypothetical to the VE upon which he based his decision at Steps Four and Five included the following mental limitations:

> We will keep the work simple, repetitive and routine. I'm attempting to limit stress and contact with that restriction. I want to put a slight limitation in contact with the public, coworker and supervisors. In defining that, I want to keep contact with the public brief and cursory. Working at fast food, it's brief, it's cursory. It falls within what I think are the parameters of this, this restriction. A bank teller; however, while it might be brief may be more complex than I'm anticipating. A shoe salesperson may be not too complicated, but it may be more prolonged than I anticipated. In dealing with coworkers, I don't see this restriction by itself limiting work on an assembly line, but this person should not be an integral member of a team that's going to participate in goal setting or process planning.

(R. 63-64, 66). These mental limitations match those the ALJ found in his determination of Jivens-Pierson's RFC: *i.e.*, she "would need work to be simple, repetitive and routine, slight limitation in contact with public, co-workers, and supervisors; would not limit work on assembly line but not a part of a team." (R. 13).

In determining these mental restrictions, the ALJ stated he gave "considerable weight" to the agency's mental assessment of Jivens-Pierson as having "a few areas of moderate limitation." (R. 16). And that he **concurred** with this assessment. *Id.*(emphasis added). However, the agency mental assessment to which he referred was that of Dr. Nelson (affirmed by agency psychologist Dr. Alsdurf) who, as noted above, found that Jivens-Pierson was

16

markedly limited in the ability to understand and remember detailed instructions and to carry out detailed instructions; and moderately limited in the ability: (1) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (2) to work in coordination with or proximity to others without being distracted by them, (3) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (4) to interact appropriately with the general public and (5) to respond appropriately to changes in the work setting. (R. 517-18).

Not all of these moderate restrictions with which the ALJ concurred were included in the RFC or in the hypothetical to the VE. And in one that the ALJ did mention, the ALJ found and propounded in his hypothetical to the VE that the claimant had "a *slight* limitation in contact with the public . . .," although Dr. Nelson found a *moderate* limitation in Jivens-Pierson's ability to interact appropriately with the general public," without explaining the similarity or difference between the two assessments. While the Court agrees with the Commissioner that the ALJ must include in the hypothetical question only the limitations he found supported by the record; that was not done here. The ALJ expressly concurred with Dr. Nelson's mental assessment; yet did not include all the limitations Dr. Nelson found in the RFC or in the hypothetical presented to the VE.

The ALJ's error can most easily be understood by reviewing the recent case of *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007). The claimant in *Haga* had numerous physical and mental impairments, and the ALJ had included non-exertional restriction in his RFC determination, limiting the claimant to "simple repetitive tasks" with "only incidental contact with the public," and "no requirement for making change." *Id.* at 1207. The consulting

examiner had filled out an RFC form indicating that the claimant was moderately impaired in seven functional categories. *Id.* The claimant argued that the ALJ had implicitly rejected this opinion by failing to include any accommodations in his RFC determination that addressed the consulting examiner's assessment that the claimant had moderate difficulty in her ability to deal appropriately with supervisors and coworkers and to respond appropriately to workplace pressures and changes. The ALJ had given no explanation relating to why he did not address some of consulting examiner's findings of moderate restrictions while including others, and the Tenth Circuit agreed that this omission required reversal so that the ALJ could explain the evidentiary support for his RFC determination. *Id*. at 1207-08.

As the Tenth Circuit explained in *Haga*, the decision of the ALJ must be reversed to allow the ALJ to address all of the moderate and marked restrictions found by Dr. Nelson. *Haga*, 482 F.3d at 1208; *Confere v. Astrue*, 235 Fed. Appx. 701, 703-04 (10th Cir. 2007) (unpublished). On remand, the ALJ must discuss all of the moderate and marked restrictions given in the opinion evidence in which he concurred, and he should specifically tie any accommodations in his mental RFC determination and subsequent hypothetical to the VE to the restrictions they address. If the ALJ rejects some of the restrictions, he must specifically state which restrictions are rejected and why.

As the Court reverses on this ground, it need not reach the other issues on appeal. The Court, however, notes that the ALJ failed to include any discussion of claimant's obesity other than finding it a severe impairment in Step Two. The Commissioner argues that such discussion was unnecessary because there is no evidence in the medical record or hearing testimony "showing that her obesity was relevant to her other alleged impairments during the relevant time frame." *Response*, p. 10 (Dkt. #16). Yet the ALJ himself points out that Jivens-Pierson's

treatment notes from the Minnesota Family Practice Clinic show that she "was informed that most of her pain stemmed from her obesity," and consulting examiner Dr. Jennings' assessment of her chronic lumbar pain included obesity. Additionally, those same treatment notes from the Family Practice Clinic attributed the moderate degenerative changes in Jivens-Pierson's lower back to morbid obesity and excessively large breasts. (R. 607-08).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Opinion and Order.

Dated this 26th day of March, 2012.

_____
Paul J. Cleary
United States Magistrate Judge